OSCN Found Document:STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WITHERS

 

 
 

 
 STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WITHERS
2019 OK 47
Case Number: SCBD-6480
Decided: 06/18/2019
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2019 OK 47, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

STATE OF OKLAHOMA, ex rel. OKLAHOMA BAR ASSOCIATION, Complainant
v.
SHAD K. WITHERS, Respondent.
BAR DISCIPLINARY PROCEEDINGS
Â¶0 In this disciplinary proceeding against a lawyer, the complaint alleges one count of unprofessional conduct deemed to warrant disciplinary sanctions. A trial panel of the Professional Responsibility Tribunal found that the Respondent's actions merit the imposition of professional discipline. It is recommended that Respondent be suspended from the practice of law for ninety days and that he pay the costs of this proceeding. Upon de novo review of the evidentiary materials presented to the trial panel,
RESPONDENT IS ORDERED DISCIPLINED BY SUSPENSION FOR A PERIOD
 OF NINETY DAYS AND DIRECTED TO PAY THE COSTS OF THIS 
PROCEEDING. THE LATTER SHALL BE DUE NO LATER THAN ONE
 HUNDRED TWENTY DAYS AFTER THIS OPINION BECOMES FINAL.
Tommy Humphries, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Complainant
Shad Withers, Attorney, Wichita, Kansas, for Respondent, pro se
COLBERT, J.
Â¶1 This disciplinary proceeding against a lawyer poses two questions: (1) Does the record submitted for our examination provide sufficient evidence for a meaningful de novo consideration of the complaint and its disposition?
[1] and (2) Is suspension for ninety days together with payment of costs an appropriate disciplinary sanction for Respondent's breach of acceptable professional behavior? We answer both questions in the affirmative.
Â¶2 Following a grievance filed by client Jackie Miller (Ms. Miller) on January 26, 2016, the Oklahoma Bar Association (Complainant) commenced an investigation against Shad K. Withers, a licensed lawyer (Respondent). On December 16, 2016, the OBA filed a formal complaint under Rule 6 of the Rules Governing Disciplinary Proceedings (RGDP), 5 O.S. 2011, Ch. 1, App. 1-A.
[2] The Complainant charged Respondent with one count of professional misconduct in violation of the Oklahoma Rules of Professional Conduct (ORPC), 5 O.S. 2001, Ch. 1, App. 3-A,[3] and are cause for professional discipline under the RGDP. The Complainant recommended suspension from the practice of law for a period of one year. Respondent answered the Complaint on January 3, 2017.
Â¶3 A trial panel of the Professional Responsibility Tribunal (PRT) conducted a PRT Hearing on February 2, 2017. Upon conclusion of the hearing, consideration of testimony (Respondent was the sole witness) and admitted exhibits, the PRT issued its Report (PRT Report) on April 24, 2017. The PRT Report found generally that Respondent had violated the ORPC Rules 1.15,
[4] 8.4(a), and 8.4(c),[5] but did not find clear and convincing evidence to support the other allegations of misconduct against Respondent asserted by the Complainant, namely violations of ORPC Rules 1.1,[6] 1.3,[7] 1.4,[8] and 1.5.[9] The PRT recommended suspension of Respondent's license to practice law for one hundred twenty days and assessed to Respondent the payment of costs incurred in this proceeding. The Complainant filed a one-count complaint to our Court in Complainant's Brief-In-Chief on May 16, 2017. Withers responded with Respondent's Brief-In-Chief on May 30, 2017.
STANDARD OF REVIEW
Â¶4 The Oklahoma Supreme Court has exclusive original jurisdiction regarding OBA proceedings. In re Integration of State Bar of Okla., 1939 OK 378, Â¶ 5, 95 P.2d 113, 114. The Court's review is de novo and takes into consideration all relevant facts in determining whether discipline is merited and what measures, if any, should be imposed for the misconduct. State ex rel. Okla. Bar Ass'n v. Donnelly, 1992 OK 164, Â¶ 11, 848 P.2d 543, 546. The Court implements its constitutionally invested, nondelegable power to regulate and control the practice of law and the legal practitioners. Tweedy v. Okla. Bar Ass'n, 1981 OK 12, Â¶ 2, 624 P.2d 1049, 1052. Under a de novo examination, the Trial Panel's findings and its recommendations are not binding nor are they persuasive upon this Court. State ex rel. Okla. Bar Ass'n v. Raskin, 1982 OK 39, Â¶ 11, 642 P.2d 262, 265. This Court has a duty to be the final arbiter for adjudication and must conduct a full-scale examination of all the relevant facts. State ex rel. Okla. Bar Ass'n v. Johnston, 1993 OK 91, Â¶ 13, 863 P.2d 1136, 1142 ("In a de novo consideration, in which the court exercises its constitutionally invested, nondelegable power to regulate both the practice of law and the legal practitioners, a full-scale exploration of all relevant facts is mandatory. The Court's task cannot be discharged unless the PRT panel submits a complete record of proceedings for a de novo examination of all material issues.").
Â¶5 Before a decision to discipline an offending attorney, the misconduct presented must be demonstrated by clear and convincing evidence, as required by Rule 6.12 of the RGDP, 5 O.S. 2001, Ch.1, App. 1-A. To make this determination of evidence and to fully discharge the court of its duty, the Trial Panel must present a complete record of the proceedings. State ex rel. Okla. Bar Ass'n v. Eakin, 1995 OK 106, Â¶ 9, 914 P.2d 644, 648. The Court must determine whether the presented record is sufficient for an independent determination of the relevant facts and to craft an appropriate discipline. State ex rel. Okla. Bar Ass'n v. Perceful, 1990 OK 72, Â¶ 5, 796 P.2d 627, 630. The record in this case consists of the pleadings filed with this Court, the exhibits admitted into the record at the PRT Hearing, the Report of the Trial Panel filed on April 24, 2017, and the transcript of the district court hearing held on February 2, 2017. After examination of the record on appeal, this Court determines that the record submitted is sufficient for the Court's de novo consideration of Respondent's alleged misconduct.
FACTUAL BACKGROUND
Â¶6 The chronology of this case is detailed and complex so it is necessary to provide a thorough summary of the facts. This case arises from Respondent's representation of a client who went to an emergency room for treatment of heart-related symptoms. The treatment given was alleged to have triggered a cardiac arrest which necessitated a readmission to the medical facility. Thereby this medical negligence action was filed in response to that incident.
Â¶7 Jackie Miller (Ms. Miller) sought medical assistance when she went to the emergency room of the Oklahoma University Medical Center (OUMC) on December 31, 2007. Experiencing pain and tenderness over her pacemaker, Ms. Miller was prescribed the medication Zofram, which allegedly caused cardiorespiratory arrest and readmission to the hospital with severe injuries as a result.
Â¶8 On September 30, 2009, Ms. Miller hired attorney David Van Meter to pursue a medical negligence action against the hospital and doctors involved in her case. Defendants included OUMC, Healthcare Services, Inc., Tarek Dernaika, M.D., Moeen Abedin, M.D., Regi Matthew Pappy, M.D., Bradley J. Johnson, M.D., and S. Brent Barnes, M.D. The claim which was filed by Mr. Van Meter on Ms. Miller's behalf asserted an attorney's lien in favor of Mr. Van Meter. On February 25, 2013, after Mr. Van Meter had spent a period of years on the case, Ms. Miller terminated the client relationship with Mr. Van Meter after she failed to accept his advice that she accept a settlement offer for a total of $25,000, as to all defendants in total. Mr. Van Meter indicated that if Ms. Miller did not accept the settlement offer, he would no longer represent her in the matter and thereafter, counsel withdrew from the case. Ms. Miller, of her own initiative on May 6, 2013, dismissed the action without prejudice.
Â¶9 On January 21, 2014, Ms. Miller retained Respondent to represent her in the previously filed medical malpractice case. Respondent at the time was employed by the law firm of Brown and Gould. Initially, Respondent and Mr. Van Meter had some preliminary email discussions regarding the attorney's lien Mr. Van Meter possessed on Ms. Miller's case. Mr. Van Meter stated that he was entitled to 50% of any proceeds for the case or a flat amount of $25,000 plus his expenses. Respondent and his firm's partner (Tony Gould) refiled the action for Ms. Miller on May 6, 2014, with all the initially named defendants but also adding a new defendant, Dr. Brian Plaxico, D.O.
Â¶10 Subsequent to the refiling of the medical malpractice action, Respondent left Brown and Gould in August of 2014, and by an agreement on August 13, 2014, Mr. Gould withdrew from the case and Respondent continued representation of Ms. Miller as a sole practitioner. This was Respondent's first experience as a sole practitioner. Mr. Gould made no attorney lien claim, offering instead that he would be satisfied with recoupment of costs incurred - approximately $705.64 - if the case resulted in recovery.
Â¶11 Respondent then pursued a conclusion to the medical malpractice case for Ms. Miller. On April 28, 2015, he was able to reach a settlement agreement with OUMC for $75,000, and with the doctors, Pappy, Abedin, Dernaika, and Johnson (Pappy, et al.), for $7,000 "in verified litigation expenses." The agreements were initially handwritten and both agreements were executed by Ms. Miller personally. Doctors Barnes and Plaxico did not participate in the initial settlement agreement and the claims against them remained unresolved. 
Â¶12 On May 3, 2015, Respondent and Ms. Miller executed a second attorney-client contractual agreement whereby the attorney fees due to Respondent was amended to 40% rather than 50% in the original agreement. The new amended section in the second contractual agreement stated that the Respondent would receive no more than 40% of the client's recovery and 10% would remain in escrow in order to satisfy the two attorney liens of Van Meter and Gould. If after the satisfaction of all lien claimants, there was still a remainder in the 10% withheld for escrow, that amount would go to the client. Ms. Miller disputes this explanation, alleging the second agreement specified 60% go to her rather than the initial 50%.
Â¶13 On August 31, 2015, a formal release of OUMC's medical claim was completed and executed in order to finalize the settlement agreement that was reached with OUMC on April 28, 2015. The forms were sent directly to Ms. Miller by email and she was able to sign the documents and return the same by fax.
Â¶14 When Respondent received the settlement check of $75,000 from OUMC on September 21, 2015, he endorsed the check with both his name and Ms. Miller's name as the check was made out to both of them. Respondent alleges that he signed Ms. Miller's name with her consent. He then deposited the check into his operating account. On September 23rd, Respondent sent a cashier's check to Ms. Miller in the amount of $22,594.56 drawn from his operating account and he contends that he sent a settlement statement along with the check. Ms. Miller alleges that she never received the settlement statement. Ms. Miller received the check in the amount of $22,594.56, leaving in escrow $11,863.43, for a potential CMS Medicare claim, and $3,042.01 for a potential Oklahoma Healthcare Authority (OHCA) claim, thus totaling $37,500.00, or 50% of the settlement paid.
Â¶15 In November and December of 2015, both CMS Medicare and OHCA waived their lien rights and Respondent proceeded to issue checks in the amounts of $11,863.43 and $3,042.01 to Ms. Miller representing their respective lien amounts. This brought the total amount of funds disbursed to Ms. Miller to $37,500.00 or 50% of the OUMC settlement amount.
Â¶16 The formal release of claims against Pappy, et al. (excluding Barnes and Plaxico), was signed by Respondent (using Ms. Miller's name) and the "signature" was caused to be notarized by Respondent on September 17, 2015. Respondent admits that he tried to replicate Ms. Miller's signature as close as possible before having it notarized. Respondent also admits that he had no power of attorney or other legal authority authorizing him to sign this agreement using Ms. Miller's name. However, Respondent alleges that he did have oral authorization to execute the formal release. However, Ms. Miller contended that she did not give Respondent permission to sign this formal release of claims against Pappy, et al.
Â¶17 On September 21, 2015, Respondent received and deposited a check made out to him from Pappy, et al., in the amount of $3,320.03, for his litigation expenses with these defendants. In both settlements (OUMC and Pappy, et al.), Respondent acknowledges that he commingled trust funds with his personal funds, knowing that it was inappropriate and thus violated RGDP rules 1.15 and 8.4(a).
Â¶18 On November 2, 2015, Ms. Miller's claim against Defendant Plaxico was dismissed with prejudice.
Â¶19 In early December of 2015, Ms. Miller called Respondent, agreeing to accept a settlement offer from Barnes. Then, on December 4, 2015, Ms. Miller subsequently attempted by email to retract the decision to agree to settle. On December 9, 2015, Ms. Miller emailed Respondent to ask if the Barnes settlement check would have her name on it. Following that, on January 6, 2016, Ms. Miller emailed Respondent again to tell him not to dismiss her case against Barnes. Later, on August 1, 2016, Barnes filed a motion to enforce settlement and the district court held a hearing regarding enforcement of the Barnes' settlement on October 28, 2016. The court concluded that the settlement agreement was valid and should be enforced because Respondent had both actual and apparent authority from Ms. Miller to accept the settlement offer from Barnes.
PROCEDURAL HISTORY
Â¶20 Ms. Miller filed a formal complaint with the OBA against Respondent on January 26, 2016, alleging multiple infractions of attorney misconduct. Ms. Miller terminated Respondent's representation in the spring of 2016. On September 8, 2016, Respondent filed a Motion for Substitution of Plaintiff's Counsel as Ms. Miller's attorney of record and the Order Allowing Withdrawal was issued on September 21, 2016.
Â¶21 The OBA formally opened a complaint and the PRT Trial Panel initiated a hearing February 2, 2017, to assess the complaints of Ms. Miller against Respondent. Though a substantial number of Exhibits were introduced, the sole witness heard from at the hearing was Respondent. The PRT Report was issued April 21, 2017.
Â¶22 Complainant agrees that all of the monies due to the client and all lien claimants have now been properly allocated. Respondent directly compensated his client within days of receiving settlement funds or lien releases (from Medicare and OHCA). However, Respondent failed to promptly notify the attorney lien claimant, Mr. Van Meter, or claim holder, Mr. Gould, of settlements in a timely manner, thus delaying the payments owed to them from the settlements. In fact, as Complainant points out, Respondent's total balance in his operating account on December 23, 2015, after full payments had already been disbursed to his client, Ms. Miller, was only $300.08. Claims from neither Gould or Van Meter had been satisfied at that point. Gould received payment from Respondent for the $705.64 owed to him on February 26, 2016. Respondent settled the payment due to Mr. Van Meter on September 29, 2016, for $7,500.00 plus any fees attained in the Barnes settlement.
DISCUSSION
Â¶23 Rationale for the "disciplinary process, including the imposition of a sanction, is designed not to punish the delinquent lawyer, but to safeguard the interests of the public, those of the judiciary and of the legal profession." State ex rel. Okla. Bar Ass'n v. Combs, 2007 OK 65, Â¶ 36, 175 P.3d 340, 351 (citations omitted). The measure of discipline imposed upon an offending lawyer should be consistent with the discipline visited upon other practitioners for similar acts of professional misconduct. Id. (citation omitted). 
Â¶24 When we examine the actions taken by Respondent in the case before us, we hold that Respondent violated ORPC Rule 1.15 when he initially and subsequently received settlement checks from the defendants and deposited each into his operating account, a clear violation of the rules of professional conduct resulting in commingling of client funds and personal funds. Respondent acknowledges this violation and accepts full responsibility for it. We evaluate a commingling infraction based on three different levels of culpability, those being (1) commingling, (2) simple conversion, and (3) misappropriation or theft by conversion; each of which must be proven by clear and convincing evidence. State ex rel. Okla. Bar Ass'n v. Combs, 2007 OK 65, Â¶ 13, 175 P.3d 340, 346; see also State ex rel. Okla. Bar Ass'n v. Cummings, 1993 OK 127, Â¶ 23, 863 P.2d 1164, 1172; State ex rel. Okla. Bar Ass'n v. Parsons, 2002 OK 72, Â¶ 12, 57 P.3d 865, 868. Each level represents a more serious infraction and thus demands more serious disciplinary action. In this case, Respondent not only commingled the settlement money with his personal funds in the operating account, he reached a point after paying his client the monies due to her, on December 23, 2015, where the balance available in his operating account was only $300.08. At that point, while payments were still due and unpaid for outside attorney claim interests (approximately $700.00 to Gould and $7,500.00 to Van Meter), the balance in his operating account was only $300.08. By operation of law, at this point there was clear and convincing evidence that his infraction became more than commingling and included simple conversion. However, we find no clear and convincing evidence that he was guilty of level three commingling which involves theft by conversion or otherwise. He never attempted to misappropriate the monies to his personal benefit.
Â¶25 Respondent's actions were also a violation of ORPC Rules 8.4(a) and (c). The PRT Report found that Respondent violated Rule 8.4(c) when he endorsed the Formal Release of Claims for the Pappy, et al. settlement, signing his client's name. Although he claimed that the signature was done with his client's permission, she disputed that fact. But more seriously, he acknowledged that after he signed the settlement agreement, he caused that signature of his client's name to be notarized, and by his admission, attempted to make the signature look as much as possible to the client's signature. Though Respondent claimed to have had the client's oral consent to effect the signature, his actions reveal that it was not, at the very least, in accord with legal procedures. He admitted that he no power of attorney or other legal authorization to sign his client's name.
Â¶26 We have reviewed all cited authority and arguments by Complainant and Respondent in this action. After a thorough review of the arguments, we must determine the necessary discipline here based upon similar infractions and previous assessments for those violations by this Court. In a review of that authority, we find several cases persuasive in determining Respondent's appropriate discipline and effective remedy. The cases that we find most persuasive and analogous to the instant case are State ex rel. Okla. Bar Ass'n v. Combs, 2007 OK 65, 175 P.3d 340; State ex rel. Okla. Bar Ass'n v. Jacques, 2000 OK 57, 11 P.3d 621; State ex rel. Okla. Bar Ass'n v. Parsons, 2002 OK 72, 57 P.3d 865; and State ex rel. Okla. Bar Ass'n v. Taylor, 2000 OK 35, 4 P.3d 1242.
Â¶27 In Combs, the respondent was held to have committed, and that he admitted to, were violations of ORPC Rules 1.15 (mishandling funds) and 8.4(a) (professional misconduct), as well as RGDP Rules 1.3 and 1.4(b). 2007 OK 65, Â¶ 13, 175 P.3d 340, 346. Contrary to the PRT's recommendation in Combs, the Court did not find an intent to defraud or deceive, and thus did not find clear and convincing evidence of a violation of ORPC 8.4(c). Id. Â¶ 19, 2007 P.3d at 351. As in this case, the court found no previous disciplinary violations, a respondent who accepted full responsibility for his actions and fully cooperated with the investigation, and neither the client nor third parties suffered any harm. Id. Though the PRT Report recommended suspension for two years plus one day, the respondent in Combs was disciplined by this Court with a ninety day suspension plus costs incurred in the proceedings. Id. Â¶ 39, 2007 P.3d at 352.
Â¶28 Another recent case decided by this Court involved a respondent who was charged with, and admitted to, fraudulently acknowledging a legal document and causing improper notarization of same. State ex rel. Okla. Bar Ass'n v. Jacques, 2000 OK 57, Â¶ 11, 11 P.3d 621, 624. Again, the respondent, never previously disciplined for professional misconduct, fully cooperated with the complainant's investigation and fully admitted the misconduct. Id. Â¶ 21, 11 P.3d at 625. In Jacques, the respondent's acts were found not to have been motivated by a desire for personal gain, but rather a result of poor judgment and management. Id. In that instance, the Court ruled that respondent was subject to a thirty day suspension of his license to practice law and required to pay the costs of the proceedings against him. Id. Â¶ 26-27, 11 P.3d at 626.
Â¶29 The Parsons case involved a respondent who, when settling a personal injury case, not only endorsed the two settlement checks without notifying an interested third party (medical provider), but also failed to ever notify the interested party for years, distributing the proceeds of the two settlement checks between himself and his client. State ex rel. Okla. Bar Ass'n v. Parsons, 2002 OK 72, 57 P.3d 865. The respondent there was also found to have violated ORPC Rule 1.15 (commingling) and Rule 8.4(c) (dishonest misconduct). In an evaluation of the 8.4(c) violation, the court held that although a violation occurred, the Complainant had failed to show by clear and convincing evidence that respondent intended to misappropriate funds by fraud or deceit. Id. Â¶ 14-16, 57 P.3d at 869. Respondent was ordered disciplined by suspension of his license for one year plus payment of costs incurred for the proceedings. Parsons can be distinguished from the instant case by the fact that, Respondent here never displayed any actions to attempt to hide the settlements from the third parties. He did contact and reimburse one attorney claimant within five months (February 26, 2016) of settlement and did reach an agreement as to settlement terms with the other claimant on March 18, 2016 - although the final settlement was not effectuated for another six months (September 29, 2016). The respondent in Parsons was disciplined by requiring a one year suspension of his licence to practice law and ordered to pay the costs of the investigation. Id. Â¶ 22, 57 P.3d at 870.
Â¶30 In summary, we agree with the PRT finding in this case that there was no clear and convincing evidence that Respondent violated ORPC Rules 1.1,1.3,1.4, or 1.5. The cases cited in support of this proposition along with the evidence and testimony do not support such a finding. Respondent's competency, diligence, communication with client, and assessment of fees were disputed. For example, Respondent was able to achieve a far better settlement than her original attorney, Van Meter, was able to achieve and, there is no evidence of lack of diligence and disputed evidence at best as to any communication or fee arrangement failures. What is supported by the evidence, is a violation of ORPC Rule 1.15 (Safekeeping Property). When Respondent deposited checks into his operating account, he by definition, violated this rule. In fact he never used his trust account, if it was even active, at any time during the case.
Â¶31 There is also no question that Respondent violated ORPC Rules 8.4(a) and (c). The more serious violation here is 8.4(c) which states that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Respondent here acknowledged that he endorsed the settlement agreement with Pappy, et al. with his client's name, attempting to make it look like his client's signature, and then having that signature notarized. Though he claimed to have oral consent to do this, he acknowledged that he did not have any legal written authority to do it and his client disputes the oral consent. However, the fact that he acknowledges trying to replicate his client's signature for notarization established an attempt at misrepresentation.
Â¶32 Assessing Respondent's actions and professional conduct violations, we must keep in mind that the disciplinary process is not designed to punish the lawyer but to safeguard the interests of the public, judiciary and the profession itself. Combs, 2007 OK 65, Â¶ 36, 175 P.3d at 351. We must also consider that the discipline imposed should bear resemblance to other practitioners for similar violations of misconduct. Id. Although this was Respondent's first experience as a sole practitioner, we cannot and do not excuse the seriousness of his infractions. 
MITIGATING FACTORS
Â¶33 Respondent's client and the other interested parties were made whole by Respondent. There was no involvement of the OBA Client Security Fund in order to accomplish this result. It was noted in the record that Respondent had no previous reprimands or complaints filed prior to this case and Respondent discontinued the practice of law immediately following the case. As was acknowledged in the PRT Report and by the Complainant, Respondent was at all times cooperative with the investigation into this complaint against him. Respondent willingly acknowledged mistakes made and showed remorse for his actions. While these mitigating factors do not excuse Respondent's violations of the rules of professional misconduct, they are to be considered when determining the appropriate discipline required. It is also noted that the client benefitted because Respondent was able to achieve a recovery that was more than 3 times higher than the prior settlement offer. Again, this does not excuse, but is a consideration, when meting out discipline. His actions displayed no purposeful intent to deceive the client or other interested parties. See Combs Â¶ 19, 175 P.3d at 347. The two attorney claim holders, though experiencing delay in the satisfaction of their claims, did not file grievances against Respondent.
CONCLUSION
Â¶34 After a thorough review of the record, the Court concludes that Respondent violated ORPC Rules 1.15 and 8.4(a) and (c). These serious violations of the rules of professional conduct require requisite disciplinary action. Upon consideration of these violations found by clear and convincing evidence, and giving due consideration to the mitigating factors tendered,
RESPONDENT IS ORDERED DISCIPLINED (1) BY SUSPENSION FOR A 
PERIOD OF NINETY DAYS AND (2) BY IMPOSITION OF COSTS OF THIS
 PROCEEDING IN THE AMOUNT OF $2,136.39, WHOSE PAYMENT SHALL BE 
DUE NO LATER THAN ONE HUNDRED TWENTY DAYS AFTER THIS 
DECISION BECOMES FINAL. 
VOTE:
Gurich, C.J., Darby, V.C.J., Kauger, Winchester, Edmondson and Colbert, JJ., concur;
Combs, J., dissent.

Combs, J., dissenting:
"I would suspend Mr. Withers for one (1) year." 

FOOTNOTES
[1] The record consists of the Complaint, Answer, transcript of the PRT Hearing, Report of the Trial Panel, Complainant's Brief in Chief, Respondent's Brief in Chief, Exhibits Not Under Protective Order, and Exhibits Under Protective Order.
[2] The Rules Governing Disciplinary Proceedings are found at 5 O.S. 2001, Ch. 1, App. 1-A. The provisions of the RGDP Rule 6.1 state:

"The proceeding shall be initiated by a formal complaint prepared by the General Counsel, approved by the Commission, signed by the chairman or vice-chairman of the Commission, and filed with the Chief Justice of the Supreme Court."

[3] The Oklahoma Rules Governing Disciplinary Proceedings are found in 5 O.S. 2001, Ch. 1, App. 3-A.
[4] Rule 1.15 -- Safekeeping Property
(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the written consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
(b) A lawyer may deposit the lawyer's own funds in a client trust account for the sole purpose of paying bank service charges on that account but only in an amount necessary for that purpose.
(c) A lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred.
(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(e) When in connection with a representation, a lawyer possesses funds or other property in which both the lawyer and another person claim interests, the funds or other property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved, and the undisputed portion of the funds shall be promptly distributed.

[5] Rule 8.4 -- Misconduct
It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

[6] Rule 1.1 -- Competency
A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.
[7] Rule 1.3 -- Diligence
A lawyer shall act with reasonable diligence and promptness in representing a client.
[8] Rule 1.4 -- Communication 
(a) A lawyer shall:
(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules;
(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
(3) keep the client reasonably informed about the status of the matter;
(4) promptly comply with reasonable requests for information; and
(5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional conduct or other law.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.
[9] Rule 1.5 -- Fees
(a) A lawyer shall not make an agreement for, charge or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent.

(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client.